ATLANTIC CITY, respondent,

*v.*

THE NEW AUDITORIUM PIER COMPANY, appellant.

[Argued June 22d and 23d, 1904.   Decided November 14th, 1904.]

1. On May 9th, 1896, Loper granted, by metes and bounds, a right to Atlantic City to maintain on a tract of land above high water a street or highway called the new boardwalk, and in his said deed covenanted not to erect any structure to the ocean side of the way so granted. This deed was recorded on June 16th. In the interval between the execution and record of this deed Loper sold and conveyed to the defendant's lessors, by one deed, the said tract of land above high water, and by another deed the lands below high water to the ocean side of the new boardwalk, which deeds were recorded on June 10th. Upon a bill filed by Atlantic City to restrain the defendant from erecting a structure on the land to the ocean side of the new boardwalk—*Held*, that the defendant's lessors took Loper's title to the land below high water without notice of the covenant contained in the complainant's unrecorded deed for the land above high water; that the construction of the boardwalk by the complainant did not impute to the defendant's lessors such notice, and that the defendant's land was not affected by the restrictive covenant contained in said boardwalk deed.

2. Mutual covenants restricting the use of land will be enforced against purchasers from such covenantors only when such alienees take with notice.

On appeal from a decree advised by Vice-Chancellor Grey, whose opinion is reported *ante p. 284*.

The controversy in this case is over a covenant made by Richard F. Loper with Atlantic City, in a writing under seal, called the boardwalk deed. This writing, which was dated April 30th, 1896, and was executed by Loper on May 9th, 1896, granted to Atlantic City the right to maintain a street over a strip of land along the Atlantic ocean, above high water. The strip is described in this deed by metes and bounds, and Loper, in addition to his grant as aforesaid, covenanted not to erect any structure on the ocean side of the public way so granted, which covenant was to run with the land. The land to which this covenant

related was under the tidal waters of the Atlantic ocean and had been recently granted to Loper by the riparian commissioners. The defendant is now in possession of this land under a lease, which by mesne leases relates to a deed executed by Loper on June 6th, 1896, by which he conveyed to the Mary A. Riddle Company and Joseph A. Brady all of the lands under water that had been granted to him by the riparian commissioners. By another deed of the same date Loper conveyed to the same grantors the land above high water, on which the new boardwalk was in course of construction. The answer sets up that these conveyances were in consummation of a sale of said lands made by said Loper to one William Riddle, on the 4th day of May, 1896, and charges that the said Riddle company and Brady took the lands so conveyed free from any covenants or restrictions contained in the complainant's deed of dedication, executed by Loper on May 9th, as aforesaid. The object of the complainant's bill is to have the defendant enjoined from erecting on said lands under water a structure which the bill alleges is in violation of the covenant contained in Loper's boardwalk deed, which covenant the bill charges was binding upon Loper and his grantees and is binding upon the defendant. A preliminary injunction was allowed upon the conclusions that are reported in *63 N. J. Eq. (18 Dick.) 644.*

Upon final hearing the defendant, in proof of the agreement of May 4th, 1896, set up in its answer, offered a written agreement of that date, which the learned vice-chancellor overruled, but directed to be spread upon the record. The agreement so offered was in these words:

"An agreement, made this fourth day of May, A. D. eighteen hundred and ninety-six, by and between William Riddle, of the first part, and Richard F. Loper, party of the second part, witnesseth: For and in consideration of the sum of one hundred and forty thousand dollars, the party of the second part has hereby sold and agrees to transfer to the party of the first part all that certain piece of land lying shoreward two hundred and fifty feet from the line of the new boardwalk, with all riparian rights in front thereof, with the further option of the purchase of the balance of the lot shoreward, at the rate of two hundred and fifty dollars per foot front, up to one hundred and fifteen feet of the land owned by Mary K. Loper, one thousand dollars ($1,000) having been paid on account of

said purchase, the receipt of which is hereby acknowledged, and the balance being payable upon signing and delivery of the deeds.

"In witness whereof, the parties hereunto have set their respective hands and seals the day and year first above written. Witness present:

    "J. BARTRAM RICHARDS,        RICHARD F. LOPER,  [L. S.]

    "REJINOLD REDFORD,         WILLIAM RIDDLE.    [L. S.]

"It is further agreed that the sum of twenty-two thousand and four hundred and ninety-nine dollars and ninety-one cents ($22,499.91) is not to be paid under this sale unless the entire one hundred and fifty feet front upon the boardwalk is used by the purchaser, and thenceforth the said sum is due upon demand. Witness present:

    "J. BARTRAM RICHARDS,        RICHARD F. LOPER,  [L. S.]

    "REJINOLD REDFORD,         WILLIAM RIDDLE."  [L. S.]

Touching this agreement Loper was permitted to testify, without objection, that $1,000 was paid upon it on May 5th, and that the two deeds made by him to Mary A. Riddle Company and Brady, dated June 6th, 1896, were in consummation of the said agreement. At the close of his case defendant's counsel renewed the offer of this written agreement and offered to prove that the purchase was without notice of the claim now set up by the complainant in its bill. This offer was overruled by the learned vice-chancellor "upon the ground that there has been nothing to show that the complainant in this suit (Atlantic City) was in any way notified of the agreement, and that it is in any way binding upon the city by way of notice or otherwise." By the final decree the preliminary injunction was made perpetual. The conclusions of the learned vice-chancellor, which are reported *ante p. 284,* are to the effect that the defendant can derive no benefit from the agreement of May 4th, 1896, because the complainant had no notice of the equitable title that passed by it, and that the defendant can derive no benefit from the priority of record of its legal title from Loper, because the defendant, when it took its deed from Loper, had implied notice of the restrictive covenant contained in the unrecorded boardwalk deed from Loper to the complainant. Accompanying each of the conclusions filed by the learned vice-chancellor in the court below is a prefatory statement setting out with great fullness all of the matters that are germane to the issue, to which, instead of repeating them here, reference is made.

*Mr. Charles D. Thompson,* for the appellant.

*Messrs. Godfrey & Godfrey* and *Mr. Jay Ten Eyck,* for the respondent.

The opinion of the court was delivered by

GARRISON, J.

The decision of the learned vice-chancellor that the defence based upon the agreement of May 4th, 1896, was entitled to no equitable consideration, for the reason that Atlantic City was in no way notified of it, and his refusal to admit the agreement itself in evidence, for the same reason, seem to involve a denial of the peculiar standing in equity of a defendant who has purchased for value without notice. Such defence does not profess to go to the merits of the controversy tendered by the complainant, but only to the propriety of the remedy that the court is asked to enforce. It is new matter in bar of the jurisdiction of equity and proceeds upon the notion that as no consideration can appeal more favorably to a court of equity than that of one who in good faith has paid for a title without notice of any encumbrance, a court of equity will not concern itself with a comparison of equities, but will content itself with a denial of its remedial assistance. "Against such a purchaser," said Lord Loughborough, in *Jerrard* v. *Saunders, 2 Ves. Jr. 454,* "this court will not take the least step imaginable." Such a purchaser "shall not be annoyed in equity" is the quaint language of Mr. Fonblanque. *2 Fonb. Eq. 151.* "It is a general and thoroughly established rule that a purchaser *bona fide* for valuable consideration, without notice of any preceding claim at law or in equity, will not be prevented by the court of chancery from availing himself of any advantage which he has acquired." *2 Spenc. Eq. Jur. 733.* "For equity," says Mr. Sugden, "will not disarm a purchaser, but assist him, and precedents of this nature are very ancient and numerous where the court hath refused to give any assistance against a purchaser, either to an heir or to a vendor, or to the fatherless, or to creditors, or even to one purchaser against another." *2 Sugd. Vend. & P. (7th Am. ed.) *1016.*

"A purchaser without notice for a valuable consideration is a bar to the jurisdiction of the court," is the way Lord Northington puts it, in *Stanhope* v. *Earl Verney, 2 Eden 81.*

"Hence the doctrine," said Chief-Justice Beasley, "so much favored in a court of equity of the inviolable nature of the defence of a *bona fide* purchase without notice for a valuable consideration." *Herbert* v. *Mechanics' Building and Loan Association, 17 N. J. Eq. (2 C. E. Gr.) 497, 500.*

The leading case upon this doctrine annotated by White and Tudor, in *Basset* v. *Nosworthy, 2 White & T. Lead. Cas. 1.*

The defendant had set up its equitable right under this agreement by answer instead of by plea, as it might do when in bar of relief only, and not in bar of discovery. *Haughwout* v. *Murphy, 22 N. J. Eq. (7 C. E. Gr.) 531, 547.*

It offered to prove the agreement so set up, which by a comparison of dates was prior to the inception of the right which the plaintiff sought to enforce, and hence necessarily without notice of it, and sufficient evidence was admitted to show the consummation of this agreement by a conveyance of the legal title and the parting with a valuable consideration for the rights so acquired. The refusal of the court below to admit the agreement in evidence left the case in a somewhat nebulous condition, but enough was proved, or offered to be proved, to establish *prima facie* the favored *status* referred to in the above citations. The proof was rejected, not because the facts had been inartificially pleaded, but because the complainant had received no notice of the defendant's equitable estate, a clearly irrelevant consideration. We think that the agreement should have been admitted in evidence.

The rejected agreement had also a material bearing upon the case upon its merits, namely, the question of notice of the boardwalk deed. By the terms of the agreement, the equitable title that passed under it recognized the new boardwalk as subsisting upon the land. This boardwalk was by law a public street. Hence, upon the question of what notice would be imputed to one who saw the new boardwalk in the course of construction by the city, the fact of acquiescence in its actual location upon the land would be a material circumstance. The assertion of a

hostile right gives rise to a very different duty from the apparent exercise of a right that has been acquiesced in. The period of time to which the proof of notice should be directed would also have been materially altered by the admission of the contract of sale.

The case has, however, been examined in its entirety upon the proofs that were admitted and dealt with in the court below.

The bill, as has been said, was filed to enforce a restrictive covenant contained in the boardwalk deed from Loper. In proof of the covenant it thus sought to enforce, the complainant offered a copy of the record of the boardwalk deed, certified by the clerk of Atlantic county, in conformity to an act respecting conveyances. Whether such copy should have been received in evidence depended upon whether the original was "such deed, conveyance, lease or other instrument" as is authorized to be recorded, and a transcript of such record received in evidence. The learned vice-chancellor admitted the certified copy offered by the complainant. From this ruling, in which we concur, and upon which the complainant's entire case rests, it follows that the rights of the complainant under said instrument must consistently be treated as subject to the recording laws contained in the conveyancing act. The documentary evidence upon this point was as follows: The deed to Atlantic City, which I have called the boardwalk deed, was executed by Loper, as found by the vice-chancellor, upon May 9th, 1896. The deed to the defendant's lessors, which I shall call the Riddle deed, was executed by Loper on June 6th, 1896. The boardwalk deed was not recorded until June 16th, 1896. The Riddle deed was recorded six days earlier, namely, June 10th. Looking, therefore, at the documentary evidence alone, it is clear that the complainant's deed is without the least legal force against the defendant's title. It is equally clear that the only way in which the complainant can subject the defendant's land to the covenant contained in its earlier deed is by proving that such subsequent deed was taken with notice of the unrecorded boardwalk deed. The burden of proving such notice rests upon the holder of the unregistered title. *Hodge* v. *Amerman, 40 N. J. Eq. (13 Stew.) 99.*

This burden, the learned vice-chancellor concluded, had been successfully borne by the complainant, not by proof of actual or constructive notice, but by implied notice; that is, by apparent conditions that charged the defendant's lessors with the duty of making inquiry, in the course of which the unrecorded deed from Loper to Atlantic City would have been discovered. The fact upon which this conclusion rests is that "during the whole period from April 20th to June, 1896, the construction of the steel boardwalk was openly going on under the direction of Atlantic City workmen and superintendents," and the considerations that led the vice-chancellor to give to this fact the force of an implied notice to Loper's grantees of the unrecorded deed of Loper to Atlantic City are: "The work on the new steel boardwalk began on April 20th, 1896, and continued until it was completed, in July of that year. The character of the structure was so permanent from its very beginning, in steel columns and girders to carry a plank walk forty feet wide, that anyone who approached it was necessarily notified that the parties erecting it were asserting a permanent right of occupation. The structure was also built at the ocean's edge and was plainly a continuous boardwalk, intended for promenaders, who might, in passing to and fro on it, enjoy the ocean view and breeze. This was erected across the property of Loper between the 20th of April and the 6th day of May, 1896. The boardwalk itself was then in full view. It was plainly a continuous way along the ocean, not only on Loper's property, but also on the property of all of the beach front owners, and just as plainly the main purpose and object of that way was manifest to every onlooker, namely, the enjoyment of the view of the sea, uninterrupted by buildings or other structures on the ocean side of the boardwalk."

"The landward side of the boardwalk was closely built up along its entire length. The oceanward side of it had at that time no buildings except Young's pier and the Iron pier. Those two were the only buildings standing oceanward of the boardwalk in 1896. This fact would of itself put anyone interested upon inquiry to ascertain why so remarkable a condition should exist."

I am unable to give to this fact either the force or the effect thus ascribed to it. The situation that the learned vice-chancellor characterized as so remarkable as to constitute in itself implied notice to a prospective purchaser, at least to the extent of putting him on inquiry, seems to me to be a natural condition that would not, of itself, arrest the attention, still less excite the suspicion of anyone. The boardwalk, as originally located and as relocated, ran along the "ocean's edge," hence the land to its west was above high water and in private ownership; while that to its east or ocean side belonged, normally, to the State of New Jersey, and until granted by the riparian commissioners, of which there is no proof that it was, except as to Loper, did not vest in private ownership. This, which may be characterized as the normal condition of affairs, would account fully for the phenomenon upon which the entire stress of the complainant's case rests, namely, the presence of buildings upon the landward side of the boardwalk and their comparative absence from the ocean side, save for a few piers. It is the condition that exists at innumerable places along our seacoast where no restrictive covenant is in force; nor is it the general rule that the absence of structures upon land is ordinarily referable to a restrictive covenant that forbids the erection of such structures. Not once in many thousands of instances is such the case. But while there is no rule that the unimproved state of land is ordinarily referable to restrictions that forbid its improvement, there is a general rule that acts of possession upon a tract of land that is described by metes and bounds are to be referred to the tract so circumscribed. In the present case all of the apparent acts relied upon as constituting notice were confined to the complainant's right of way upon the upland described by metes and bounds in one of the two deeds from Loper to the Riddle grantees, which was not the deed by which the land upon which the *locus in quo* was situated was conveyed to them. So that the affirmative case for the complainant is that the visible condition referable to the upland conveyed by Loper under deed number one was not only not to be confined to the metes and bounds within which it was being exercised, or to the metes and bounds of the larger tract of which the boardwalk

was a part, but was notice of a restriction that applied only to other lands conveyed by Loper by another deed. The nature ·of this apparent condition does not seem to me, as I have said, to sustain this conclusion. One of the facts found by the court below was that from April 20th Atlantic City was in open and notorious possession of the strip of land upon which the new boardwalk was being erected, which, by force of the statute of 1895, was a street; and a stipulation of counsel shows "that along the property now owned by the defendant's lessors the columns were sunk and the floor beams were being placed on April 29th, 1896." The boardwalk deed was dated April 30th, and executed by Loper on May 9th. Obviously, therefore, the city, on April 20th, did not take possession of its street under that deed. How it got possession concerned Loper alone. He could license such use of his land. He could, if he chose, acquiesce in the location of the street. So could a purchaser from him, and so, I take it, must a purchaser from him who bought the land subject to what he actually saw on the ground, which was a continuous and apparent easement of a street of the city. This was the attitude of the Riddle purchasers. Acquiescing, whether by choice or by force of legal rules, in the rights that the city was exercising, they were not required to make inquiry respecting rights in which they acquiesced, still less respecting other rights that the city might claim in other lands of a different character, having a different source of title and conveyed to them by a different conveyance.

In the face of these considerations, I am unable to reach the conclusion that the complainant proved that the purchasers whose deed was first recorded had implied notice of the unrecorded boardwalk deed of the complainant.

The learned vice-chancellor also decided that Loper, by executing the boardwalk deed, became a party to a general scheme from which he could not have withdrawn and of which his restrictive covenant was an essential feature. The grounds upon which this conclusion was reached have not been reviewed, for the reason that such schemes bind purchasers for value from such covenantors only when such alienees take with notice. "Such stipulations," said Chief-Justice Beasley, in *Brewer* v.

*Marshall, 19 N. J. Eq.* (*4 C. E. Gr.*) *537, 543,* "have been repeatedly held obligatory, not only upon such owners, but upon their alienees, taking with notice."

In *DeGray* v. *Monmouth Beach Club House Co., 50 N. J. Eq.* (*5 Dick.*) *329,* the first head-note of Vice-Chancellor Green's opinion is: "A covenant restrictive of the use of land will be enforced in equity against subsequent purchasers with notice." This decree was affirmed by this court upon this opinion. The check-list was filed February 26th, 1894, but I do not find in the reports any mention of the case in this court.

Notice being as essential to this branch of the complainant's case as to that which has been considered, nothing further need be added unless it is to say that the case does not show that any other covenantor had acquired the state's title to lands under water, and as in the deed itself they are described merely as owners of land fronting on the beach, it would scarcely be equitable to hold Loper, by mere presumption, to that part of the scheme that apparently affects him alone. Equity, which always looks to equality, being in this particular class of cases based also upon reciprocity, or at least upon the capacity to reciprocate.

The conclusion I have reached is that the complainant failed to prove that the legal title that was superior to its own was taken with notice of the right that it now seeks to enforce, and that the decree of the court of chancery should be reversed and the complainant's bill dismissed.

*For affirmance*—None.

*For reversal*—The Chief-Justice, Dixon, Garrison, Pitney, Swayze, Bogert, Vredenburgh, Vroom, Green, Gray —10.